# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DANIEL PATTA NASUNIN d/b/a MT. VIEW THAI VIDEO,<br><br>      Plaintiff,<br>  v.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF AGRICULTURE, FOOD AND NUTRITION SERVICE,<br><br>      Defendant. | Case No. 3:10-cv-00277-SLG |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

### MOTION PRESENTED

Before the Court is the Motion for Summary Judgment filed at Docket 34 by defendant United States of America, Department of Agriculture, Food and Nutrition Service ("USDA"). Plaintiff Daniel Patta Nasunin opposed at Docket 41 and the USDA replied at Docket 49.[1] For the reasons presented below, the defendant's motion is GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND

Under the federal Supplemental Nutrition Assistance Program ("SNAP"),[2] low-income households receive credit that can be used to purchase eligible food items at participating retail locations. SNAP credit is placed on plastic cards and processed through the Electronic Benefit Transfer ("EBT") system. The entire system is electronic, with all SNAP transactions centrally recorded and monitored.

---

[1] After briefing on the Motion concluded, the Government filed supplemental authority. *See* Docket 52; Docket 55; Docket 56.

[2] 7 U.S.C. § 2011 *et seq.* (replacing the former Food Stamp Act).

Trafficking in SNAP benefits is prohibited by statute and regulation.[3] The definition of trafficking includes "[t]he buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other than eligible food[.]"[4] Retail stores that engage in trafficking are subject to permanent disqualification from SNAP.[5] The USDA monitors SNAP transactions by means of the "Anti-Fraud Locator using Electronic Benefit Retailer Transactions" ("ALERT") system, a computer program designed to recognize suspicious spending patterns that suggest fraudulent transactions.[6] When ALERT identifies a store with suspicious spending patterns, the USDA commences an investigation. An investigation may lead to administrative proceedings in which the store owner is afforded an opportunity to demonstrate that the suspicious transactions were not trafficking.

Mr. Nasunin is a naturalized U.S. citizen who is originally from Laos and now resides in Anchorage, Alaska.[7] He owns Mountain View Thai Video ("Thai Video")[8] in Anchorage.[9] Thai Video began as a convenience store that rented and sold videotapes and DVDs, but has evolved into an Asian food market that caters to a southeast Asian clientele, and particularly individuals and families of Laotian, Hmong, and Thai

---

[3] 7 U.S.C. § 2021(a), (b); 7 C.F.R. § 278.6(a).

[4] 7 C.F.R. § 271.2.

[5] 7 U.S.C. § 2021.

[6] Docket 35-9 at 2 (Ex. H).

[7] Docket 41-1 at 2 ¶ 3.

[8] The storefront bears the name "Thai Market." Docket 33-2 at 20 (A.R. 41).

[9] Docket 41-1 at 2 ¶ 6.

descent.[10]  Thai Video stocks southeast Asian specialty items that Mr. Nasunin believes are likely not available in other Anchorage stores; he describes his clientele as "very loyal."[11]

Physically, Thai Video occupies approximately 1,200 square feet in a strip mall in the Mountain View neighborhood.[12]  It has one checkout counter that is approximately two feet by four feet, one cash register, and no optical scanner.[13]  The store provides shopping baskets, but no shopping carts.[14]  The EBT terminal was located on the checkout counter.[15]  Thai Video does not stock many items with even-dollar prices.[16]

Mr. Nasunin's wife, Phattra Nasunin, is the only other person who has worked at Thai Video.[17]  Mr. Nasunin is primarily responsible for managing the store, including ordering and stocking items, assisting customers with their shopping, maintenance, and repairs.[18]  Ms. Nasunin is primarily responsible for operating the cash register and

---

[10] Docket 41-1 at 3-4 ¶¶ 11, 22.

[11] Docket 41-1 at 4 ¶¶ 22-25.

[12] Docket 33-4 at 4 (A.R. 70).

[13] Docket 33-4 at 4 (A.R. 69).

[14] Docket 33-4 at 4 (A.R. 69).

[15] Docket 41-1 at 4 ¶ 26.

[16] Docket 35-5 at 1 (Ex. D).

[17] Docket 41-1 at 2 ¶¶ 7, 20.

[18] Docket 41-1 at 3 ¶¶ 17-18.

checking out customers.[19]  Mr. Nasunin occasionally operates the cash register when Ms. Nasunin needs a break or is occupied with a customer.[20]

Between February and July of 2010, several SNAP transactions were conducted at Thai Video in patterns that the ALERT system flagged as suspicious.  Frederick Conn, a program specialist with the USDA Food and Nutrition Service, was assigned to investigate the transactions.[21]  On August 24, 2010, Mr. Conn conducted a store visit.[22]  On September 20, 2010, the USDA sent a letter to Mr. Nasunin informing him that he was being charged with trafficking.[23]  The letter also stated that the sanction for trafficking was permanent disqualification from SNAP, as well as possible fiscal claims for recovery and possible civil and criminal actions.[24]  The letter identified several series of transactions that fell into the following five categories of suspicious patterns: (1) "multiple purchase transactions were made too rapidly to be credible"; (2) "multiple transactions were made from individual benefit accounts in unusually short time frames"; (3) "the majority or all individual recipient benefits were exhausted in unusually short periods of time"; (4) "there were an unusual number of transactions ending in a same cents value";[25] and (5) "excessively large purchase transactions were made from

---

[19] Docket 41-1 at 3 ¶¶ 17-18.

[20] Docket 41-1 at 4 ¶ 19.

[21] Docket 35-2 at 1 (Ex. A, Conn Decl.).

[22] Docket 33-5 at 26 (A.R. 122); Docket 35-2 at 1 (Ex. A, Conn Decl.).

[23] Docket 33-3 at 3-5 (A.R. 45-47).

[24] Docket 33-3 at 3-4 (A.R. 45-46).

[25] The final agency decision dismissed the same-cents transactions as evidence, finding them to "not necessarily conclusively demonstrate trafficking."  Docket 33-6 at 12 (A.R. 135).

recipient accounts."[26]  A list of the transactions was attached.[27]  The letter required Mr. Nasunin to respond in writing or by telephone within 10 days if he sought "to present any information, explanation, or evidence" regarding the charges.[28]

On October 4, 2010, after receiving no response, Mr. Conn called Mr. Nasunin to confirm that he had received the letter.[29]  Mr. Nasunin confirmed receipt but said he had not understood the letter; he also claimed that rice sales accounted for the suspicious transactions.[30]  He offered to provide the USDA with register receipts and invoices of the rice purchases and was given until October 8, 2010 to do so.[31]  On October 5, 2010, Mr. Nasunin called and informed the USDA that he did not have register receipts.[32]  He was instructed to provide any documentation he did have by October 8, 2010.[33]

The USDA received a written response from Mr. Nasunin on October 7, 2010.[34] In that response, Mr. Nasunin stated that most of Thai Video's higher-value sales were rice sales.[35]  He explained that the store sold 50-pound bags of rice for $53 and that

---

[26] Docket 33-3 at 3 (A.R. 45).

[27] Docket 33-3 at 6-24 (A.R. 48-66).

[28] Docket 33-3 at 4 (A.R. 46).

[29] Docket 33-5 at 2 (A.R. 98).

[30] Docket 33-5 at 2 (A.R. 98).

[31] Docket 33-5 at 2 (A.R. 98).

[32] Docket 33-5 at 2 (A.R. 98).

[33] Docket 33-5 at 2 (A.R. 98).

[34] Docket 33-5 at 1.

[35] Docket 33-5 at 1 (A.R. 97).

sometimes, families would buy 15 or 20 bags at a time.[36] He attached invoices of rice

purchases for June 2009 and February-May 2010.[37] Mr. Nasunin offered no other

explanation for the transactions identified in the USDA's letter.

Based on the transaction data, the information collected from the store visit, and

the explanations and documentation regarding rice sales provided by Mr. Nasunin, Mr.

Conn prepared an ALERT Case Sanction Determination, finding that rice sales did not

explain the transactions and recommending permanent disqualification.[38] On October

13, 2010, the USDA sent Mr. Nasunin a letter stating that he had been permanently

disqualified from SNAP based on a determination that he had engaged in trafficking.[39]

By letter dated October 18, 2010, Mr. Nasunin requested administrative review.[40] He

indicated that initially, he had not clearly understood the charges, but he had come to

understand them more clearly and wished "to present more proper evidence to show

that no illegal actions occurred."[41] The USDA accorded Mr. Nasunin an opportunity to

---

[36] Docket 33-5 at 1 (A.R. 97). *Cf.* Docket 33-5 at 2 (A.R. 98) (Mr. Conn analyzed this explanation and determined: "20 50 pound bags of rice is half a ton. That equates to 7500 cups of cooked rice. For a 30 day period, that equates to 250 cups of cooked rice per day, or 83 1/3 cups per meal. . . . The HH making the two largest transactions made them in consecutive months, June and July ($688.00 and $800.00), so IF they were in fact buying [the] large quantities of rice claimed by the retailer, it seems that it would be more rice than any family could eat.").

[37] Docket 33-5 at 5-9 (A.R. 101-05) (invoices); Docket 33-5 at 2 (A.R. 98) (identifying invoices as having been submitted with the handwritten response).

[38] Docket 33-5 at 2-4 (A.R. 98-100). This document is dated October 13, 2010, but contains an addendum that appears to have been added at a later date. Docket 33-5 at 4 (A.R. 100).

[39] Docket 33-5 at 20 (A.R. 116).

[40] Docket 33-5 at 19 (A.R. 115).

[41] Docket 33-5 at 19 (A.R. 115) ("I didn't understand the violation that was discuss[ed] in the first letter. I realize now that the information that I present[ed] to [the officer in charge] in your

provide additional information to support his position in the review process, but he failed to provide any further evidence.[42]  On November 18, 2010, the USDA issued a 16-page final agency decision sustaining its decision to permanently disqualify Mr. Nasunin from SNAP.[43]

Mr. Nasunin subsequently retained counsel and timely filed his Complaint in this action on December 20, 2010 seeking an order granting a de novo hearing and setting aside the Government's final agency decision.[44]  The USDA answered on June 1, 2011.[45]  Discovery closed on July 10, 2012.[46]

Mr. Nasunin has testified that Thai Video's gross sales have dropped an estimated 75% since the store's disqualification from SNAP.[47]

## DISCUSSION

### I.  Applicable Legal Standards.

This action comes before the Court on a motion for summary judgment.  A plaintiff challenging his disqualification from SNAP is entitled to de novo review in federal district court, in which he "may offer any relevant evidence available to support

---

Sacramento Field Office was inadequate.  Currently I do understand the charges more clearly and wish to present more proper evidence to show that no illegal actions occur[red].").

[42] Docket 33-5 at 23 (A.R. 119); Docket 33-6 at 15 (A.R. 138) ("Appellant stated they planned to submit proper evidence in support of the transactions being legitimate.  As of the date of this decision, said documentation had not been provided.").

[43] Docket 33-6 at 2-17 (A.R. 125-140).

[44] Docket 1 at 4.

[45] Docket 7.

[46] Docket 25.

[47] Docket 41-1 at 5 (Nasunin Aff. at ¶ 28).

his case, whether or not it has been previously submitted to the agency."[48]  Thus, in this proceeding, the parties are not limited to the administrative record, but may present new arguments and evidence.  Where appropriate, a SNAP disqualification challenge may be determined by summary judgment.[49]

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The burden of showing the absence of a genuine dispute of material fact lies with the moving party.[50]  In a case involving SNAP disqualification for trafficking, the moving party (here, the USDA) "does not need to provide evidence that a store was caught 'red-handed' engaging in a food stamp violation in the summary judgment stage."[51]  7 U.S.C. § 2021(a)(2) provides that SNAP disqualification for trafficking may be made "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer

---

[48] *Kim v. U.S.*, 121 F.3d 1269, 1272 (9th Cir. 1997) (citing 7 U.S.C. § 2023(13); *Wong v. United States*, 859 F.2d 129, 132 (9th Cir. 1988); *Redmond v. United States*, 507 F.2d 1007, 1011–12 (5th Cir. 1975); *Sims v. United States Dep't of Agriculture Food & Nutrition Serv.*, 860 F.2d 858, 862 (8th Cir. 1988)); 7 U.S.C. § 2023(15).  *Kim* was decided under the Food Stamp Act, which has been replaced with SNAP, but the case law remains applicable.

[49] While the statute provides for trial de novo, that does not preclude summary judgment.  *See, e.g., Kim*, 121 F.3d 1269 (affirming district court's grant of summary judgment).

[50] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[51] *Young Choi Inc. v. U.S.*, 639 F. Supp. 2d 1169, 1178 (D. Haw. 2009) (citing *Kahin v. U.S.*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000)).

system."[52]  If the USDA meets this burden, the store owner must present specific factual evidence demonstrating the existence of a genuine issue of fact.[53]  The store owner may not rely on mere allegations or denials.[54]  He must demonstrate that enough evidence supports the alleged factual dispute to require a finder of fact to make a determination at trial between the parties' differing versions of the truth.[55]

When considering a motion for summary judgment, a court must accept as true all evidence presented by the non-moving party, and draw "all justifiable inferences" in the non-moving party's favor.[56]  But to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[57]  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[58]  If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment is appropriate.[59]

---

[52] This explicit statutory provision, providing that EBT data can support a finding of trafficking, is dispositive of Mr. Nasunin's general comments regarding the potential untrustworthiness of electronic information.  *See* Docket 42 at 28-29.

[53] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).

[54] *Id.*

[55] *Id.* (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

[56] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[57] *Id.* at 248.

[58] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)).

[59] *Anderson*, 477 U.S. at 249.

A party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

> (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.[60]

In a case challenging a permanent SNAP disqualification, if the plaintiff does not meet his burden of demonstrating a genuine dispute of material fact in response to a motion for summary judgment, the court then reviews the agency's imposition of the penalty.  This review is limited to the administrative record and the court will overturn the agency's decision only if it determines that the penalty imposed was arbitrary and capricious.[61]

## II.    De Novo Review.

As discussed below, the USDA has fully met its initial burden of demonstrating trafficking by presenting specific transactions and evidence in the administrative record and with its motion.  Thus, while the Court addresses the USDA's evidence, the Court's analysis focuses on whether Mr. Nasunin has met his burden of demonstrating genuine disputes of material fact as to whether trafficking occurred.

---

[60] Fed. R. Civ. P. 56(c)(1).

[61] *Wong v. U.S.*, 859 F.2d 129, 132 (9th Cir. 1988) (citing *Banh v. United States*, 814 F.2d 1358, 1363 (9th Cir. 1987); *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 561 (9th Cir. 1986) (per curiam); *Bertrand v. United States*, 726 F.2d 518, 520 (9th Cir. 1984)).

### A. Mr. Nasunin's General Explanations.

In the administrative proceeding, the USDA relied on numerous transactions to support its determination that Mr. Nasunin had engaged in trafficking, including many transactions with Thai Video's southeast Asian clientele.  But in the present Motion for Summary Judgment, the USDA has focused on specific transactions associated with four non-southeast Asian SNAP account holders.[62]  It is from this perspective that the general explanations in Mr. Nasunin's opposition are reviewed.  Those explanations that relate to all of the charges include the following:

- Regarding excessively large transactions: "It is Nasunin's understanding that many of the ethnic group households that are customers of his store are quite large and that, as a result, bulk and large purchases of items, in particular of rice, at [the] store are fairly common."[63]

- Regarding excessively large transactions: "Nasunin believes based on what he has heard from shoppers in the store that sometimes several [of the above-described] families will pool their grocery needs and have a person holding a SNAP card shop for them."[64]

- Regarding excessively large transactions: "Phattra Nasunin gave many Asian customers who frequented the store informal 'credit' when they didn't [have] enough money to buy the groceries they needed for their households."[65]

---

[62] The USDA does not appear to abandon the numerous other suspicious transactions that formed the basis of the administrative decision.  Rather, as Mr. Nasunin acknowledges, the examples of four specific sets of transactions in the USDA's motion "were assuredly not simply chosen at random by [the USDA] and its attorneys, but . . . were almost certainly cherry-picked from the ALERT data in order to make the strongest case possible for granting summary judgment."  Docket 42 at 30.

[63] Docket 42 at 9 (citing Nasunin Aff. at ¶ 30).

[64] Docket 42 at 9 (citing Nasunin Aff. at ¶ 32).

[65] Docket 42 at 11 (citing Nasunin Aff. at ¶ 44); *see also* Docket 35-3 at 8-10 (Ex. B, Phattra Nasunin Dep. at 11-13) (explaining credit process); Docket 35-3 at 12 (Ex. B, Phattra Nasunin Dep. at 21) ("Q. In 2010, who were the people [Ms. Nasunin] was giving loans to?  A. It's only Hmong and Laotian people."); Docket 35-3 at 15 (Ex. B, Phattra Nasunin Dep. at 37) ("Q. Did

- Regarding rapid back-to-back transactions: "Sometimes customers paying off the credit amount would also buy groceries, which resulted in a second SNAP transaction made shortly after the first one."[66]

- Regarding rapid benefit exhaustion: "Nasunin asserts that it was not uncommon to see persons shopping at the store who would purchase items literally down to the last dollar on their card and believes that this is, by and large, because the stock his store carried met all of the dietary needs of the particular ethnic groups that shop at it."[67]

- Regarding same cents or even dollar transactions: "Nasunin describes that, for Asian customers, his store had a practice of rounding off the balance due on purchased items to the lower even dollar, and in particular when the purchase exceeded $50. He asserts that for many of the shoppers who came to the store, this rounding off was appreciated, even though it was generally only in the nature of a few cents."[68]

As is clear from the quoted language, each of these explanations is particular to Thai Video's southeast Asian clientele. But since the USDA's motion is focused on transactions conducted by four non-southeast Asian SNAP beneficiaries, the above explanations are inapplicable to the transactions at issue in this motion.

Mr. Nasunin's general explanations that apply to all Thai Video shoppers are:

- Regarding rapid benefit exhaustion and large transactions: "Nasunin noticed over the time that the store had the SNAP terminal available that many of the shoppers at his store would

---

you ever give credit to a white man? A. No."). Accepting SNAP benefits in payment for a credit account is prohibited by regulation and punishable by a one-year disqualification period. 7 C.F.R. § 278.2(f).

[66] Docket 42 at 12 (citing Nasunin Aff. at ¶ 48).

[67] Docket 52 at 10 (citing Nasunin Aff. at ¶¶ 35-36).

[68] Docket 42 at 10 (citing Nasunin Aff. at ¶¶ 37-38); *see also* Docket 35-3 at 13 (Ex. B, Phattra Nasunin Dep. at 23).

purchase their groceries at the beginning of the month when the new benefit money was put on their cards."[69]

- Regarding small then large transactions: "He also observed the making of an initial small purchase on a SNAP card before a larger purchase was made during the same visit so that the amount of benefits that are remaining on the card could be determined."[70]

- Regarding rapid back-to-back transactions: "Nasunin explains that, because of the way his store is set up, it is easy to move items through the checkstand area quickly, and that his wife is very fast using the register more or less as a calculator."[71]

- Regarding rapid back-to-back transactions: Shoppers who were related or friends would help each other out if one did not have enough SNAP benefits; or customers would shop together, each paying for part of the purchase.[72]

Whether these general explanations create any genuine issue of material fact with respect to the sets of transactions at issue in this motion is discussed herein.

### B. The Transactions.

Mr. Conn prepared an analysis of the suspicious transactions ("Conn Analysis"), which the USDA relies on in its motion.[73] Four individuals receiving SNAP benefits were selected: S.G., R.M., G.T., and R.G.[74]

---

[69] Docket 42 at 9 (citing Nasunin Aff. at ¶ 33); *see also* Docket 35-3 at 8 (Ex. B, Phattra Nasunin Dep. at 11).

[70] Docket 42 at 9 (citing Nasunin Aff. at ¶ 34).

[71] Docket 42 at 10 (citing Nasunin Aff. at ¶ 39).

[72] Docket 42 at 10-11 (citing Nasunin Aff. at ¶¶ 40-42).

[73] Docket 35-2 at 1 (Ex. A, Conn Decl.).

[74] Docket 35 at 7. For privacy reasons, the Court has used initials rather than names to identify the SNAP account holders whose benefits were used in the suspicious transactions.

*i.* *S.G. Transactions.*

The SNAP account of S.G., an Alaska Native female,[75] was used in a single suspicious transaction at Thai Video:

> June 1, 2010, 1:22 p.m.: $276[76]

The Conn Analysis found this transaction to be trafficking based on S.G.'s spending patterns:

> This is not an Asian HH [household], and this one transaction at Mt[.] View is the only transaction made by this HH at an Asian store during the entire period of analysis. It is also, by $148, the largest transaction made by the HH during this period. There were only three other transactions greater than $100 made by the HH, all at western, or non Asian, supermarkets. While we can accept that a non Asian person might occasionally shop at an Asian store, it is unlikely that a non Asian HH would, apparently out of the blue, with no prior (SNAP) history of doing such, spend such a large amount of their monthly SNAP benefit ($276.00) at a small Asian grocery store.[77]

The Conn Analysis also noted that the transaction was for an even-dollar amount and nearly depleted the account balance, leaving only 81 cents remaining.[78]

In response to the USDA's May 2, 2012 discovery requests, Mr. Nasunin stated the following:

> **INTERROGATORY NO. 6**: As to [S.G.], the records show purchases by [S.G.] from 2/10/2010 until 7/04/2010. She made only one purchase at Mt. View Thai Video that is twice as much as she ever spent. Please explain the purchase on 6/01/2010.

---

[75] Docket 35-13 at 1 (Ex. L).

[76] Docket 35-5 at 3 (Ex. D).

[77] Docket 35-5 at 1 (Ex. D). The Conn Analysis includes a list of S.G.'s other SNAP transactions. Docket 35-5 at 3 (Ex. D).

[78] Docket 35-5 at 1 (Ex. D).

**ANSWER**: Plaintiff has no recollection of this specific transaction, and thus cannot provide any explanation responsive to the interrogatory.[79]

**REQUEST FOR ADMISSION NO. 12**: Please admit that you cannot explain the purchasing pattern for [S.G.] on 6/01/2010.

**ANSWER**: Admit.[80]

In his opposition, Mr. Nasunin calls into question the rationale presented by the Conn Analysis and argues that "there are probably 100 equally plausible explanations" for S.G.'s transaction,[81] but he offers no specific evidence about this transaction that puts its legitimacy into dispute. The only one of Mr. Nasunin's general explanations that could apply to this type of transaction is his statement that some customers tend to purchase groceries at the beginning of the month, soon after receiving new benefits.[82] However, this explanation is more applicable to regular customers, who would be stocking up on their usual food supplies, and not to happenstance customers such as S.G. who, as Mr. Nasunin argues, may have been trying Thai Video's offerings on a whim.[83] Accordingly, Mr. Nasunin has not presented sufficient evidence to place into dispute the USDA's determination that the S.G. transactions were trafficking.

---

[79] Docket 35-14 at 2 (Ex. M).

[80] Docket 35-14 at 6 (Ex. M).

[81] Docket 42 at 23 n.96; Docket 42 at 36-37 ("Perhaps [S.G.] had heard about Nasunin's store from a friend and was interested in trying it out, perhaps she was out with a friend who decided to stop there and [S.G.] liked the merchandise she saw. Perhaps she decided to try southeast Asian food on a whim, bought a quantity of it, and then decided she didn't like it.").

[82] Docket 42 at 9 (citing Nasunin Aff. at ¶ 33); *see also* Docket 35-3 at 8 (Ex. B, Phattra Nasunin Dep. at 11).

[83] *See supra* n.81.

ii.    *R.M. Transactions.*

R.M.'s SNAP account was used in three suspicious transactions at Thai Video:

> June 1, 2010, 1:26 p.m.: $200
> June 1, 2010, 5:44 p.m.: $50
> June 2, 2010, 3:39 p.m.: $180[84]

The Conn Analysis determined these transactions to be suspicious because they did not fit with R.M.'s spending history, explaining:

> these three transactions are the only transactions made by this HH, not only at Mt[.] View, but at *any* Asian store during this period. Other than one $23.00 transaction at a Carrs supermarket (local chain affiliated with Safeway), these three are the only even dollar transactions made by the HH[.][85]

In addition, the first and second transactions, for $200 and $50 respectively, were conducted only five hours apart on the same day, while the third transaction, for $180, occurred the following day.   Thus, R.M. spent $430 at Thai Video within a 24-hour period, without a history of using SNAP benefits at Asian stores.   The first $200 transaction was made only 3 minutes and 33 seconds after S.G.'s SNAP account was used for a $276 transaction.[86]   The final $180 transaction was made only 3 minutes and 45 seconds after another transaction.[87]   The final transaction nearly depleted R.M.'s account, leaving only $8.41 remaining.[88]

---

[84] Docket 35-12 at 2 (Ex. K).

[85] Docket 35-12 at 2 (Ex. K).

[86] Docket 35-12 at 2 (Ex. K); Docket 35-5 at 3 (Ex. D).

[87] Docket 35-12 at 2 (Ex. K).   The other transaction was a $27.22 transaction that completely depleted R.G.'s account.

[88] Docket 35-12 at 2 (Ex. K).

Mr. Nasunin asks "Other than the fact that the ALERT system flagged these transactions as suspect, what is remarkable about them?"[89]  This question overlooks that the ALERT system does not randomly flag transactions; it is programmed to identify transactions following patterns that analysts have determined are indicative of trafficking.[90]  And those transactions are then investigated—in this case, by Mr. Conn, who conducted a store visit and closely analyzed R.M.'s spending history.[91]  Thus, the USDA relies on several facts beyond the ALERT system's flagging in arguing that these transactions were trafficking, thereby meeting its burden.

Mr. Nasunin made the following responses to the USDA's May 2, 2012 discovery requests:

> **INTERROGATORY NO. 8:** As to [R.M.], the records show purchases by [R.M.] from 2/10/2010 until 7/12/2010.  He made three purchases all in a row for even dollar amounts.  Please explain the purchases on 6/01/2010 and 6/02/2010.
>
> **ANSWER**: Plaintiff has no recollection of these specific transactions, and thus cannot provide any explanation responsive to the interrogatory.[92]
>
> **REQUEST FOR ADMISSION NO. 6**: Please admit that you cannot explain the purchasing information for [R.M.] on 6/01/2010 and 6/02/2010.
>
> **ANSWER**: Admit.[93]

---

[89] Docket 42 at 37.

[90] Docket 35-9 at 1 (Decl. of Pierce).

[91] Docket 35-2 at 1 (Ex. A, Conn Decl.).

[92] Docket 35-14 at 3 (Ex. M).

[93] Docket 35-14 at 4-5 (Ex. M).

Mr. Nasunin does not offer any additional specific evidence concerning the R.M. transactions that demonstrates a genuine dispute as to the USDA's determination that these transactions were trafficking. Nor do Mr. Nasunin's general explanations demonstrate a genuine dispute regarding these transactions.

      *iii.    G.T. Transactions.*

      G.T.'s SNAP account was used in one suspicious transaction at Thai Video:

      February 4, 2010, 2:28 p.m.: $194[94]

G.T. is an Alaska Native[95] whose mailing address on file with the USDA was a homeless shelter located in downtown Anchorage.[96] The Conn Analysis explained this transaction was suspicious given G.T.'s spending habits:

> Except for the one transaction made at Mt. View Thai Video, all other transactions [between February 1 and July 31, 2010] were made at Bus Stop Grocery convenience store and Carrs 1802 supermarket, both much closer to the downtown area than Mt. View Thai video. Aside from the $194.00 transaction made at Mt[.] View Thai, the largest SNAP transaction made by this HH during this time was in the amount of $48.26 at Carrs.[97]

In addition, the Conn Analysis points out that the transaction was made only 42 seconds after a $154 transaction by another individual with the same homeless shelter address who does not bear a southeast Asian name.[98]

---

[94] Docket 35-11 at 1 (Ex. J).

[95] Docket 35-13 at 1 (Ex. L).

[96] Docket 35-11 at 1 (Ex. J).

[97] Docket 35-11 at 1 (Ex. J).

[98] Docket 35-11 at 1 (Ex. J).

In response to the USDA's May 2, 2012 discovery requests, Mr. Nasunin stated the following:

> **INTERROGATORY NO. 7:** As to [G.T.], the records show purchases by [G.T.] from 2/03/2013 until 7/22/2010. She made only one purchase from Mt. View Thai Video that is almost four times as much as she ever spent elsewhere. Please explain the purchase on 2/04/2010.
>
> **ANSWER**: Plaintiff has no recollection of this specific transaction, and thus cannot provide any explanation responsive to the interrogatory.[99]
>
> **REQUEST FOR ADMISSION NO. 9**: Please admit that you cannot explain the purchasing information for [G.T.] on 2/04/2010.
>
> **ANSWER**: Admit.[100]

Mr. Nasunin has not presented any additional evidence regarding the G.T. transactions that raises a genuine dispute of fact. Nor do the general explanations he has provided place into dispute the USDA's determination of trafficking.[101]

---

[99] Docket 35-14 at 2-3 (Ex. M).

[100] Docket 35-14 at 5.

[101] Mr. Nasunin cites *Skyson USA, LLC v. United States*, an unreported case from the District of Hawai'i, as holding that "SNAP transactions even as short as seven seconds apart can be determined to be valid." Docket 42 at 38 (citing *Skyson*, CV 09-00278BMK, 2010 WL 651032 (D. Haw. 2010)). Mr. Nasunin does not cite to a specific page of that decision and this Court did not locate any such seven-second ruling. The store in *Skyson* had a two-step checkout process: first, the store owner created a written invoice and subtotaled the amount; second, the customer went to the checkout stand, where a clerk entered the subtotaled amount and charged the EBT card. *Skyson*, 2010 WL 651032 at *3. Because the subtotaling was a separate step, it is more plausible that large transactions could be conducted at the EBT terminal in rapid succession, as the clerk had only to enter a single amount for each transaction. By contrast, at Thai Video, Ms. Nasunin totals each transaction on the cash register and then charges the EBT card for that transaction.

*iv.   R.G. Transactions.*

The Conn Analysis also examines four suspicious transactions made at Thai Video using the SNAP account of R.G., a Caucasian male,[102] from March 2009 to October 2011.[103]   The R.G. transactions present somewhat more complicated factual issues than the other transactions discussed above due in part to the fact that R.G. was incarcerated near the time of these transactions.   However, as Mr. Nasunin has not raised a genuine dispute of material fact regarding the specific S.G., R.M., and G.T. transactions, and as even a single instance of trafficking requires permanent SNAP disqualification,[104] an analysis of the R.G. transactions is not necessary to the Court's determination of this motion.

### C. Other Evidence.

On this motion, the USDA bears the initial burden of persuasion.   Here, the USDA has presented ample evidence, of a type relied on by courts within this Circuit, to meet that initial burden to demonstrate that the trafficking occurred.[105]   The burden thus shifts to Mr. Nasunin to present specific facts that demonstrate the existence of a genuine issue of fact.   As discussed above, Mr. Nasunin has not met this burden with respect to three of the specific sets of transactions identified by the USDA in its motion.

---

[102] Docket 35-13 at 1 (Ex. L).

[103] Docket 35-10 at 1 (Ex. I).

[104] 7 U.S.C. § 2021(b).

[105] Docket 35-9 at 1 (Pierce Decl.) (explaining ALERT criteria for flagging EBT transactions); *Kahin v. U.S.*, 101 F. Supp. 2d 1299, 1313-14 (S.D. Cal. 2000) (relying on EBT transaction information); *Kee Lee v. U.S.*, 1:11-CV-0881 AWI DLB, 2013 WL 127752 (E.D. Cal. 2013); *Mansi v. U.S.*, 11-0903-CV-W-ODS, 2013 WL 1189709 (W.D. Mo. 2013).

Nor has Mr. Nasunin met this burden by providing any other general evidence that puts the USDA's determination into dispute.  The only evidence in the record that contradicts that provided by the USDA is the Nasunins' own testimony.  Ms. Nasunin testified at her deposition that Thai Video only accepted SNAP benefits for eligible food items.[106]  Mr. Nasunin has testified by affidavit that neither he nor Ms. Nasunin "ever allowed a SNAP card to be used at [his] store other than in the way it was intended to be used" and that neither he nor Ms. Nasunin "[has] ever taken a single penny from a SNAP transaction that the store was not entitled to receive in the form of profit from the groceries sold."[107]  However, the Ninth Circuit has held that "[a] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.[108]  Thus, the Nasunins' testimony—lacking any supporting documentation or detailed information regarding the suspicious transactions at issue—does not create a genuine issue of material fact sufficient to withstand summary judgment.

Mr. Nasunin argues that he "should be given the opportunity to develop these genuine issues of material fact at trial."[109]  However, discovery has closed and the contours of the factual evidence available to the parties have been defined.  Mr.

---

[106] Docket 35-3 at 6, 11 (Phattra Nasunin Dep. at 9, 19)

[107] Docket 41-1 at 8 ¶¶ 55-56.

[108] *F.T.C. v. Publg. Clearing H., Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (citing *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993); *United States v. One Parcel of Real Property*, 904 F.2d 487, 492 n. 3 (9th Cir. 1990)); *Burchett v. Bromps*, 466 Fed. Appx. 605, 607 (9th Cir. 2012) ("single statement in a deposition" insufficient to create triable issue of fact) (citing *F.T.C.*).

[109] Docket 42 at 38.

Nasunin's opportunity to demonstrate a triable issue of fact as to the legitimacy of the S.G., R.M., and G.T. transactions was with his opposition to the USDA's motion. As no such genuine dispute of material fact has been demonstrated, there is no basis for this case to proceed to trial.

### III. Review of the Permanent Disqualification Sanction.

When reviewing an agency decision under the arbitrary and capricious standard, a court is to consider "the sanction imposed by the [USDA] in light of the administrative record to judge whether the agency properly applied the regulations [and] to determine whether the sanction is 'unwarranted in law . . . or without justification in fact.'"[110] Mr. Nasunin's opposition does not argue that the penalty imposed on him was arbitrary and capricious. Nonetheless, this Court will consider whether the permanent disqualification sanction imposed in this case was warranted under the law and justified in fact.

7 U.S.C.§ 2021(b) provides that disqualification from SNAP "shall be . . . (3) permanent upon (B) the first occasion or any subsequent occasion of a disqualification based on the purchase of coupons or trafficking in coupons or authorization cards by a retail food store or wholesale food concern[.]" Thus, the sanction was clearly warranted in law. Mr. Nasunin acknowledges that even a single instance of trafficking is enough to support permanent disqualification.[111]

The USDA's determination was also justified in fact. In reaching its decision, the USDA considered "whether, through a preponderance of evidence, it is more likely true

---

[110] *Wong v. U.S.*, 859 F.2d 129, 132 (9th Cir. 1988) (quoting *Plaid Pantry Stores, Inc. v. U.S.*, 799 F.2d 560, 563 (9th Cir. 1986)).

[111] Docket 42 at 37.

Case 3:10-cv-00277-SLG   Document 58   Filed 04/17/13   Page 22 of 26

than not true that the questionable transactions were the result of trafficking."[112] The agency was presented with extensive evidence of trafficking, which included the following:

(1) rapid back-to-back transactions: "37 sets of transactions involving one or more households conducted in five minutes or less."[113]

(2) repeat transactions: "30 sets of transactions ranging from less than one minute to under five hours with values ranging from $116.93 to $898.62."[114]

(3) rapid benefit exhaustion: "30 sets of transactions [exhausting benefits] covering the review period ranging from $60.00-$529.31."[115]

(4) same cents transactions: "50 transactions ending in same cents values of "00" ranging in values of $50.00 to $800.00."[116]

(5) excessively large transactions: "92 transactions ranging from $150.00 to $800.00."[117]

The agency was also presented with several maps and charts that demonstrated the level of SNAP business Thai Video was conducting within the relevant time period was unusual, both in the context of its own history and as compared to other similarly sized stores.[118]

---

[112] Docket 33-6 at 4 (A.R. 127).

[113] Docket 33-6 at 5 (A.R. 128).

[114] Docket 33-6 at 6 (A.R. 129).

[115] Docket 33-6 at 7 (A.R. 130).

[116] Docket 33-6 at 12 (A.R. 135).

[117] Docket 33-6 at 12 (A.R. 135).

[118] Docket 33-6 at 10-14 (A.R. 133-37).

Mr. Nasunin's response to the charges in the administrative record consisted of the following:

- a one-page handwritten letter responding to the USDA's initial letter;[119]
- Mr. Conn's account of telephone conversations with Mr. Nasunin;[120]
- purchase invoices indicating the amounts of rice purchased by Thai Video for June 2009 and February to May 2010;[121] and
- a letter requesting administrative review of the disqualification.[122]

As discussed above, the only explanation Mr. Nasunin provided in these documents was that Thai Video's high-value transactions reflected rice sales.[123]  After the initial disqualification decision, Mr. Nasunin indicated that he had additional evidence to submit, but failed to provide anything further.[124]

In the Complaint, Mr. Nasunin alleges that his efforts to cooperate with and participate in the administrative proceeding were hampered by "language barriers" and "a poor understanding of the process."[125]  In his opposition to the USDA's motion, Mr. Nasunin asserts that the USDA's investigation "does not disclose any effort by [the USDA] to deal with the language barrier between Nasunin and the investigator."[126]

---

[119] Docket 33-5 at 1 (A.R. 97).

[120] Docket 33-5 at 2 (A.R. 98).

[121] Docket 33-5 at 5-9 (A.R. 101-05).

[122] Docket 33-5 at 19 (A.R. 115).

[123] *See supra* at 5-7.

[124] Docket 33-6 at 15 (A.R. 138).

[125] Docket 1 at 3 ¶¶ 12, 17.

[126] Docket 42 at 9 n.38.

These statements, taken together, could be construed as an argument that the agency failed to accommodate Mr. Nasunin's lack of sophistication and difficulty with the English language. However, evidence in the record indicates that this was not the case. Mr. Nasunin stated that during the administrative proceeding, he "sought the aid of a friend in the Asian grocery business to assist him in providing additional information[.]"[127] And Mr. Nasunin, in his October 18, 2010 request for review at the agency level, explicitly stated that while he had not previously understood the charges, he did by that time, and that he intended to submit additional documentation—but then failed to do so.[128] The Court finds that at least by the later stages of the administrative proceedings, the agency had no reason to believe that Mr. Nasunin was prejudiced by any language difficulties and lack of sophistication, and therefore its permanent disqualification decision was not arbitrary and capricious on this basis.[129]

In rendering its final decision, the agency was faced with an overwhelming quantity of evidence demonstrating trafficking, with only a poorly supported assertion that rice sales explained some of the transactions. Other courts have upheld permanent disqualification in similar circumstances.[130] Based on this evidence, it was proper for the agency to determine that "it is more likely true than not true that program

---

[127] Docket 42 at 9 n.38.

[128] Docket 33-5 at 19 (A.R. 115).

[129] Moreover, Mr. Nasunin is now represented by counsel during this de novo review.

[130] See Kahin v. U.S., 101 F. Supp. 2d 1299, 1304 (S.D. Cal. 2000); Young Choi Inc. v. U.S., 639 F. Supp. 2d 1169 (D. Haw. 2009); Kee Lee v. U.S., 1:11-CV-0881 AWI DLB, 2013 WL 127752 (E.D. Cal. 2013); Mansi v. U.S., 11-0903-CV-W-ODS, 2013 WL 1189709 (W.D. Mo. 2013).

violations did, in fact, occur as charged[.]"[131]   Given that factual determination, the

penalty of permanent disqualification was appropriate as explicitly authorized by statute.

## CONCLUSION

For the foregoing reasons, the USDA's Motion for Summary Judgment is

GRANTED.

DATED at Anchorage, Alaska this 17th day of April, 2013.


<u>*/s/ Sharon L. Gleason*</u>
United States District Judge

---

[131] Docket 33-6 at 16 (A.R. 129).